388 A.2d 19.

Louis C. Hansen *et al.* *v.* Norman L. Stocking *et al.*

JULY 12, 1978.

Present: Bevilacqua, C.J., Joslin, Kelleher and Doris, JJ.

Kelleher, J.   This is a Superior Court partition suit in which all the litigants, some 35 in number, agree that a parcel of real estate and the building situated thereon located in the central business district of Providence on the south-easterly corner of Westminster Mall and Snow Street should

be sold. Today's appeal involves but one defendant, Mrs. Barbara R. Hotchkiss, and one plaintiff, the William H. Low Estate Company (the estate). Mrs. Hotchkiss is the appellant. Her sole objection is to a judgment entered in the Superior Court approving that portion of the master's report which included a provision compensating the estate for its leasehold interest in the parcel.

To the thousands, and perhaps millions, of downtown shoppers who have made their way along Providence's Westminster Street, the property in question was and is still known as the Kinsley Building. Most shoppers, we are sure, were totally unaware of how and under what conditions this landmark came into existence. It all began on June 1, 1901, when Sarah A. Cranston, a widow, leased a parcel of land to the estate for a period of 99 years. The lease provided that the estate could demolish the then existing structures and at its own expense erect a new structure on the leased premises. The lease also stipulated that sometime within the last 9 to 6 months of its term a group of appraisers would be appointed to evaluate the building's worth and the lessor, her heirs, and assigns would then purchase the structure from the estate for the appraised price.

True to its promise, the estate, after clearing the parcel, built a five-story brick mercantile building. The ground floor was originally occupied by a large store, and the other four floors were designed to provide space for professional offices. The second to fifth floors were each designed to house 21 office units. The building covers the entire frontage along Westminster Mall and a substantial portion of the Snow Street frontage.

After Sarah Cranston's decease, her interest in the land passed on to her heirs in fractional fee-simple portions. Mrs. Hotchkiss' share amounts to a 1/24 interest. In time the estate acquired a 1/144 interest from one of the heirs.

As suburban shopping malls began to appear and make their presence felt, the demand for rental space in

Providence's central business district declined. Eventually, the Kingley Building's rental revenues diminished, operating expenses increased, and the building's vacancy rate rose to a point where it was in excess of 25 percent. Thus, in April 1975, 13 of Sarah's heirs, together with the estate, instituted these proceedings.

Subsequently, the Superior Court entered an order appointing a master and authorizing him to appraise the property and sell the land together with the building and appurtenances thereon. The appraiser estimated the parcel's fair market value at $165,000. He reached this conclusion by employing the capitalization-of-income approach and verified his findings by considering sales of comparable retail parcels. The commissioner advertised the sale and solicited sealed bids. When the bids were opened in court, all of them were below the appraised figure. The trial justice recessed the hearing so that the bidders could reconsider their positions. When the hearing resumed, the highest bidder agreed to pay the appraised value.

In his report the master informed the court that the net proceeds of the sale available for distribution amounted to $154,119.84. According to the master, two thirds of this amount, or $102,746.56, would be divided among the 17 various interests in the freehold. The remaining third, or $51,373.28, would be paid to the estate and represents the value of its leasehold interest.

As noted earlier, Mrs. Hotchkiss' sole objection is to the one-third distribution to the holder of the leasehold interest. According to her, a reading of the 1901 lease makes it quite clear that the estate as lessee is entitled to nothing. Thus, she claims that the entire $154,000-plus should be distributed solely to the holders of the freehold interest. In taking this position, Mrs. Hotchkiss presents an argument that is extremely ingenious but totally unpersuasive.

Mrs. Hotchkiss contends that by the terms of the lease the only time the estate can benefit from the lessor's covenant to

purchase the building is during the final year of the lease. She reaches this conclusion by pointing to language found within the purchase covenant in which it states that the lessor will buy the building "provided that the same [lease] shall not have been previously terminated * * *." Mrs. Hotchkiss reminds us that there is a difference between "termination" and "expiration" of a lease. She refers us to cases which indicate that the word "terminate," when used in a lease, connotes a severance of the landlord-tenant relationship prior to the expiration of the lease's term, whereas when a lease speaks of its "expiration," it means when the lease has run its course and come to an end. Mrs. Hotchkiss concludes her argument by pointing out that the estate, by its participation as one of the parties plaintiff in this proceeding, has effectuated a termination of the lease prior to its expiration, and, therefore, it is barred from claiming any interest in the proceeds of the commissioner's sale.

We cannot fault the authorities cited by Mrs. Hotchkiss, but we would remind her of the sagacious comments made by Judge Learned Hand when he observed that the courts should be wary of "mak[ing] a fortress out of the dictionary"[1] since

> "There is no more likely way to misapprehend the meaning of language — be it in a constitution, a statute, a will or a contract — than to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, it disregards the over-riding purpose because the particular occasion which has arisen, was not foreseen. That there are hazards in this is quite true; there are hazards in all interpretation, at best a perilous course between dangers on either hand; but it scarcely helps to give so wide a berth to Charybdis's maw that one is in danger of being impaled upon Scylla's rocks."[2]

---

[1] *Cabell* v. *Markham*, 148 F.2d 737, 739 (2d Cir. 1945).

[2] *Central Hanover Bank & Trust Co.* v. *Commissioner*, 159 F.2d 167, 169 (2d Cir. 1947).

This court has said that, in construing a lease, the parties' intent is to be gleaned from the lease's language. *Humble Oil & Refining Co.* v. *Lennon*, 94 R.I. 509, 182 A.2d 306 (1962). In looking at the language, we shall attempt to steer a steady course through semantic seas so that the patent purpose of the 1901 document may be effectuated rather than stultified. As it relates to the building, the lease stipulates that the estate will surrender peaceful possession of the building on the "expiration of the term, demise, or other sooner determination of this lease," and the buildings and improvements which may be put upon said premises by lessee shall be pledged for the "payment of all rent and the performance of all [the lessee's] covenants." An analysis of the lease language indicates that the lessee could be divested of its interest in the new building by the happening of either one of the following events: (1) the estate could at its option terminate the lease if the demised premises were "damaged by fire to the extent of more than one-half the value thereof,"[3] and (2) Sarah A. Cranston or her heirs could "put an end to this lease" if the lessee continued to violate any of the lease provisions for a period of 6 months following a written demand from the lessor for compliance.

Immediately following these clauses comes the portion of the lease which relates to the obligation of the lessor to purchase the lessee's building. Sarah A. Cranston and her heirs and assigns were bound to purchase the building "before the expiration of this lease, provided that the same shall not have been previously terminated and that said party of the second part [the estate], its successors and assigns shall have kept and performed all the covenants and agreements on its and their part herein contained * * *."

---

[3]The option to terminate is part of that portion of the lease which required the estate to keep the building fully insured against loss by fire. Sarah, her heirs, and assigns were to be named as the loss payees. According to the lease, they were entitled to retain the policy proceeds, but if the estate decided to abide by its covenant to keep the premises in repair and elected to restore the charred premises, Sarah, her heirs, and assigns were then obligated to pay the proceeds over to the estate.

There is no question that until March 19, 1976, the day the commissioner deeded the Kinsley property to the highest bidder, the estate had, during the almost 75 years the lease had been in existence, kept all its promises. It is obvious that in June 1901 neither Sarah A. Cranston nor the estate considered the possibility that the parties to the lease would voluntarily end their arrangement because of a disadvantageous economic climate. It was, as Judge Hand said, a particular occurrence which arose but "was not foreseen."

In determining the meaning of "terminate" as used in the context of Sarah A. Cranston's 1901 covenant to purchase the estate's building in the year 2000, we believe that an examination of the lease leads but to one conclusion — the only event which would cause a termination of the lease and a consequent forfeiture by the estate of its leasehold interest would be the estate's continued failure to comply with the obligations it assumed when it signed the lease. Everyone concedes that up until the time the commissioner executed its deed, neither Sarah A. Cranston nor any of her successors had any cause "to put an end to this lease" because the estate as the lessee faithfully performed all its promises. Simple justice dictates that the estate be compensated for its leasehold interest.

The defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed.

Mr. Justice Weisberger did not participate.

*Edward F. Hindle, Ernest N. Agresti, Joseph V. Cavanagh, Jr.,* for plaintiff.

*Smith & Smith, Incorporated, Z. Hershel Smith,* for defendant.